Okay, the next case on the docket is 516-0541, People v. Peterson. Arguing for the appellant, Drew Peterson, is Demetrius Golfus. Arguing for the appellee, State of Illinois, is Leah Bendit. Each side will have 10 minutes for their argument. The appellant will also have 5 minutes for rebuttal. Please remember only the clerk of the court is permitted to record these proceedings. Welcome this afternoon. Mr. Golfus, would you like to proceed? Yes, Your Honor. Good afternoon, Your Honors. May it please the court, counsel. I'm Demetrius Golfus. I'm from the Office of the State Appellate Defender and I represent Drew Peterson. There have been five issues raised in this appeal. Although all of them are important and merit the court's attention, I'll be focusing my argument today on Mr. Peterson's claim that the trial court erred by denying his motion to suppress eavesdropping recordings. I'm going to be discussing two specific reasons why the court erred. First, the state's attorney who gave authorization to law enforcement to pursue the overhear was the alleged victim in this case, and consequently, he was incapable of exercising sound judgment, the sound judgment that the legislature intended state's attorneys to use when determining whether to grant authorization to pursue an overhear. The second reason is that the judge who ultimately granted the eavesdropping order was not impartial because he participated in a law enforcement investigation in this case before he received the eavesdropping application. What do you mean he participated? Judges typically don't participate. I was curious. You're absolutely right. They typically do not. What happened here is 20 days before the chief judge of the Will County Circuit Court received the eavesdropping application, he went to personally interview Antonio Smith, who was the state's primary witness at trial, and he was the person who wore the eavesdropping device. He went to Stateville Prison and personally interviewed him for 30 to 45 minutes. He went there with several Will County prosecutors, a Will County state's attorney investigator, and also an agent of the FBI. It's important to emphasize, Your Honors, that this wasn't just a scenario of the judge passively overhearing information about an ongoing investigation. This wasn't a scenario of the judge asking law enforcement to provide additional information in support of an application that he had already received. He elicited information for law enforcement, information that could be used in his investigation, in a subsequent prosecution, and even the eavesdropping application itself. He did law enforcement's job. He was an adjunct law enforcement officer. Do you have any information as to who initiated the meeting? Was this something that the judge did to respond on his own initiative, or did someone ask him to interview this potential witness? The record does not reveal that information, Your Honor. Thank you. Is it my understanding that he stated his reasoning for interviewing this witness to get his own understanding of the credibility that the witness had? Your Honor, I don't believe that the record supports the notion that the judge himself stated his reasoning. There was, I believe the FBI agent testified, and Mr. Smith testified, and also the FBI agent Clark's investigative report said that the judge wanted to determine the witness's credibility. But again, we don't know if that's what the judge was actually thinking. That's just those people's opinion. Assuming that that was his reasoning for doing that, does that change the perspective that you have in terms of, is that law enforcement, or is that the judge doing something that he's permitted to do? No, it does not, Your Honor. His role as a judicial officer with supervision and control over the eavesdropping process is not triggered by statute until he receives an application. And in every other context in criminal law, if a judge actively participates in an investigation, he's no longer impartial. Do you have any information that, as a result of the interview, he transferred it to law enforcement? That is, the result of the discussions? Did he convey the information that he might have gained in the interview to law enforcement? Law enforcement was present during the interview. Actually in the room. That's my understanding from the record. I mean, that's my understanding from the record that he was there with several Will County prosecutors investigator Silich from the Will County State's Attorney's Office, and Agent Clark from the FBI. That is my understanding of the record. But Mr. Golfus, in following up to what Justice Barberos was asking you about credibility, that's what the report says. And so, one could almost infer that the judge had been told something by law enforcement that he needed to get this credibility determination, whether it was going to be a search warrant, an overhear, whatever. Do we know any more from the record that you're aware of? Because I really couldn't find anything. We don't. All we know from the record is that he interviewed him, the judge interviewed Antonio Smith for 30 to 45 minutes, and according to the FBI agent, Agent Clark, he did, and I'm paraphrasing his testimony, the judge did what the FBI did when they interviewed Antonio Smith. Had he already been charged? Had Drew Peterson already been charged with the solicitation? No. No, he had not. This was before the eavesdrop and before charges were brought. And I'd also add that the investigation was to occur in Randolph County, and the Randolph County State's Attorney did not become involved at any point during the eavesdropping process. The Attorney General's Office wasn't notified as to what was going on until November, late November of 2014, when the majority of the eavesdropping was already done, which brings me to the next point, and that's that the legislature intended the State's Attorney, and not just any prosecutor in any State's Attorney's office, the State's Attorney to have control and supervision over eavesdropping within his or her county. Okay? And if we look at the federal case law, specifically United States v. Giordano for the Supreme Court, and they're interpreting the purpose behind the federal eavesdropping statute, and what they say is the role of a prosecutor is to exercise sound judgment when determining whoever to authorize law enforcement to pursue an overhear order. A State's Attorney who has a personal interest in the case, who stands to benefit personally by giving that authorization to law enforcement, cannot exercise sound judgment. State's Attorney Glasgow should have contacted the Randolph County State's Attorney and let Randolph County handle it, and I know the State has argued in its brief that, and I know this was a position of law enforcement at trial and the prosecution during the suppression hearing, that this was done because they wanted to keep everything a secret, because Drew Peterson is a high-profile defendant, and they didn't want anything to leak. But let's keep in mind, who knew of the eavesdropping? You had several prosecutors in the Willow County State's Attorney's office, an investigator, you had multiple FBI agents, multiple people at IDOC, and you also had Antonio Smith's cellmate. Even he knew. And yet, the State's position is that letting the Randolph County State's Attorney know is just too much and just too big of a risk. And with all due respect, that's an excuse. My time is expiring here in about a minute and a half. With the last points I want to make, I want to talk about the State's argument that any errors with respect to the eavesdropping are essentially harmless because there's reasonable cause for the overhear, to issue the overhear order. And I want to make three points. The first is that when you look at the suppression test, and the test that we use in Illinois was taken from the Giordano case from the Supreme Court. Our suppression test does not ask whether there is reasonable cause or sufficient legal cause to issue an overhear. And the Supreme Court in Giordano did not ask that. The second point I would like to make is that in the Fourth Amendment context, which both parties  and that judge is not neutral and detached, suppression is required, even if there's probable cause. And the last point I would make is, and this has to do more so with the State's Attorney oversight safeguard. It's important to remember that there's two individuals, independent people, with responsibility. The State's Attorney and the Circuit Judge. And what that tells us is the legislature envisioned a scenario where there could very well be reasonable cause to grant an overhear, but the State's Attorney could nonetheless decline to give authorization because he or she thinks eavesdropping is not warranted under the circumstances. So a failure to satisfy, just because there's reasonable cause does not mean that excuses a failure to satisfy the State's Attorney authorization requirement. And Judge, I see my time is up. I just have one question. Mr. Peterson was ultimately charged with the murder for hire and solicitation of murder. He was charged by whom? It was by information. No, but by which State's Attorney? By Randolph County. Okay. So what is your position as far as Judge, I may butcher his name, but Judge Schoenstedt, does he become a witness in the case? For purposes of the suppression hearing, absolutely. And yeah, he could even be called as a witness at trial. Yes, absolutely. All right, thank you. Thank you, Your Honors. Any other questions, judges? No. Justice Wharton? I'd like to maybe in rebuttal hear your perspective on the fact that you've been charged with the murder of Judge Schoenstedt. I'm not aware of the fact of the errors that you've alleged here. So I just want to give you a heads up of what I'll be looking at on rebuttal. Okay, thank you. Ms. Bendick? Sorry, I have to unmute myself. Okay, yes. Please the court, counsel. My name is Leah Bendick from the Illinois Attorney General's Office, and I'm here on behalf of the people. Like my opponent here today, my plan is to focus on the first two allegations of the second claim, but of course I welcome questions on any issue at any time. Now, with regard to the suppression issue, I want to begin by acknowledging that because there's one-party consent here, the Fourth Amendment analysis simply does not apply, and suppression is governed solely by statute. The relevant statute is reproduced in relevant part in the Appellee's Brief Appendix at pages 6 through 8, and for both of these points about the state's attorney conflict and about the judge's involvement, defendant is relying on the same ground for suppression under the statute. Under section 108A-9, this ground is listed as asking whether the eavesdropping order was improperly granted. Case law implementing and evaluating suppression under the statute has clarified that two things need to be present before suppression is appropriate. First, there needs to be some statutory requirement that was not satisfied, and second, that failure has to, quote, directly and substantially implement the legislative intent to limit the use of eavesdropping devices. So what that means, essentially, is there needs to be, again, part of the statute was not satisfied, number one, and number two, there has to be privacy concerns raised under those circumstances. Now, with regard to both of these allegations about the state's attorney and the judge, I want to discuss them together because the analysis is similar. Now, when we're looking... Let me just interrupt you one second, because you said because there's a one-party consent, only this statute is what we should be looking at, right? But the statute itself, 108A-9, it's pretty vague. I mean, under A1, it's like the conversation was unlawfully overheard and recorded. I mean, there's no definition of that, or the authorization under which the device was used was improperly granted. Do you think a judge having a per se conflict of interest would be an improper grant? No, and the reason is because under section 108A-4, the statute specifies what needs to be present for an overhear to be authorized, and that says that, number one, that there has to be one-party consent, and number two, it sets forth this reasonable cause standard about, number one, suspecting that a felony has been committed, is being committed, or is about to be committed, and number two, that there's reasonable cause to believe that these overhears will capture relevant conversations. So when the statute is governing when these eavesdropping orders should be granted, that itself shows the standard for when an order is or is not improperly granted. It has nothing about the judge. It has nothing about the state's attorney. Now, even if this court wants to consider whether a conflict on the part of the state's attorney or the judge should potentially raise, you know, a ground for suppression, we should also consider the fact that, under the case law I just mentioned, it has to be not only that the statute is not satisfied, but also that it's connected to privacy concerns. And so, when is there a privacy concern? Well, there would only be a privacy concern raised if a different judge or a different state's attorney having looked at doing this task of authorizing the application or whether to sign this order authorizing the overhear, would a different objective person have made the same call? So yes, that's why it dovetails with this reasonable cause standard. There is no privacy concern if the eavesdropping is satisfied. There is simply no case law in Illinois that has ever addressed this question of a conflicted state's attorney or a potentially, you know, allegedly biased judge and how that should affect suppression. But it's just that the statute that you have requires that it be tied to these privacy concerns. And there's only privacy concerns where the eavesdropping themselves are unjustified. Defendant has not even attempted to argue that there was no reasonable cause here. And certainly the panel can look directly at the application itself. It's found in Defendant's Exhibits D and E in the record. And it provides extensive detail about the information that the defendant has provided and the evidence that the defendant has provided about their conversations. And there was corroboration from both documentation and from phone calls that were contemporaneous to the events that Smith was providing. So it would be quite bold for this court in the absence of any case law or any guidance in the statute itself to suddenly newly recognize an automatic per se kind of reversal rule when what we do have from the case law is an indication that suppression should be tied to privacy concerns. Now if we do want to look at Fourth Amendment cases, we should consider the fact that Fourth Amendment case law talks about the different situations or it looks, when we're talking about potential bias, at the role of where are we at in the proceedings. If the proceedings are ongoing and the question is whether to substitute out the official and get a different state's attorney to do that function, to get a different judge to look at the case, maybe there's more room in that situation to be over cautious and to err on the side of caution and go ahead and allow the substitution. But here what we're talking about is suppression of reliable evidence. We're talking about a conviction based on that reliable evidence. And to overturn that conviction should be a much narrower situation where the bias is manifest. Now my state's attorney Glasgow benefited from this in sort of the conflict of interest context. But when this Fourth Amendment case law is talking about this bias, what it's concerned about instead is when the bias has colored the decision by the official. And that again turns on whether a different person objectively without this alleged bias would have made the same call. And if the over here is justified, there are simply no privacy concerns that need to be protected by suppressing and reversing the conviction. So are you saying that the fact that the Randolph County state's attorney issued the information, there was an independent evaluation that would have removed all taint from this process? Well, I mean, in one sense no, because at that point the state's attorney wasn't evaluating whether to authorize the application. But certainly that shows the Randolph County state's attorney thought there were grounds to pursue the charges based on the overhears. I do think it's an independent question. But I guess the point is sort of a harmless air type of point. If we're talking about looking at whether we're just assuming for the sake of argument that there is a conflicted state's attorney and a biased judge. If a different person standing in their shoes without that bias or without that conflict would have made exactly the same call to authorize the application or to sign the order, then there's nothing to be gained from the suppression. It's not tying to the privacy concerns that the statute is so concerned with. And it would be an over extensive remedy to fix this harm in that way. I also want to contest though, of course the people acknowledge the fact that state's attorney Glasgow was the target, was the victim in this case. But we do contest the notion that this judge was not impartial for the reasons outlined in our brief. We set forth the fact that what the judge did here is exactly what the statute has the judge do potentially when they receive the application. Of course one of the key questions is what is the credibility of this person who is consenting to the overhear. The fact that it occurred before that formal filing was in his hands doesn't show bias in the nefarious sense that the judge somehow stepped out of the judicial role. Exactly what he did was entirely in line with what his task would and could have been exactly under the terms of the statute. Do you remember how long it was between the time of his interview and the issuance of the application for the overhear? Yes, it was 20 days. So the interview happened on October 3rd at Stateville and the application was filed on October 23rd. So it was 20 days later. I still don't understand why a judge from Will County and Will County prosecutors would come down to Randolph County and not let Randolph County people know. I don't get that. One minor point about the record, I agree with everything that my opponent said in his opening argument, but I would note that this interview happened at Stateville Correctional Center, which is in Joliet, which is in Will County. And so before they had transferred Antonio Smith back to Menard, he was much closer when he was at Stateville. So it actually made Randolph County as quite distant from Joliet. You're right. I forgot he was in Stateville. He was not in Menard at the time. Right. That's true. And I see my time is expiring, but otherwise we'd stand on our brief regarding the other issues. And unless there are further questions, we would ask that the judgment of the Randolph County Circuit Court be affirmed. Any questions, Justice Barberis? Justice Wharton? I have one question. Assuming that the judge wanted to test the credibility of this particular witness and went to interview the witness, it would seem to me that recognizing the need to be independent, he certainly wouldn't go with a group of law enforcement agents. How do you explain that? Well, just to flip your point around, I think if the point is that everything that the judge and Antonio Smith talked about was entirely proper if they had been alone in the room together or if they had been in a courtroom, that actually makes the state's point that the judge never stepped outside the judicial role. Instead, this seems to have been just trying to preserve resources while the inmate was logistically closer to Will County at the time. I do have one follow-up question to Justice Wharton's question. And maybe you said this and I didn't catch it, but in relation to who was in the room during the interview with the witness and the judge, do you have a different understanding than Mr. Golfis did in terms of were the state's attorneys, did the FBI agent, was he there, any other law enforcement agents in the room  as far as the record indicates? It seems that there was, I think, one or two Will County assistant state's attorneys. There was Will County state's attorney investigator Silich and FBI agent Clark in the room with the judge as far as we can tell from the record, which is a bit ambiguous, but I think that's exactly what my opponent said as well, so I would agree. Thank you. Any other questions? Okay, Mr. Golfis, rebuttal, and please recall Justice Wharton's questions about the cumulative effect of any errors you allege. We'll unmute you. Thank you. Okay. I will certainly get to the justice question about cumulative error, but I first, if the court allows, I'd like to address some of the points that counsel made. With respect to the argument that the judge did what he otherwise would have done had he been given an application first, let's keep in mind that this didn't occur in a courtroom. It didn't occur in a judge's chambers. There wasn't a court reporter present. Nothing was taken on the record, and this wasn't a scenario of the state's attorney bringing in a witness and questioning him, enlisting testimony to present to the judge. This was the judge doing the questioning in a prison. That's outside of a judicial function. Well, no, I mean, had there been an application, I mean, in search warrants, for example, it's not uncommon for the officers to bring the informant in before court or the judge and give some testimony, right? Absolutely, and the key word that you just used there, it was in before the court. Well, now we have video conferencing, but I understand what you're saying. I do want to make a point. When you look at the Giordano case, the scenario that they had there was a failure to satisfy the prosecutor authorization requirement, and what the court said in Giordano was the failure to satisfy that requirement is reversible per se, because that requirement directly and substantially pervers the legislature's intent. That language mirrors the suppression test, and they reversed on that basis alone. So, let me ask you this. If the judge, we agree, would have absolutely no business in that prison, what harm ultimately was caused by that? I think that's what Justice Wharton wants you to address. Is this a no harm, no foul thing? Sure. I mean, really? So what? Somebody else charged him based upon the information? They found it reasonable? I think that's what Justice Wharton, I know I am interested in. You have removed the safeguard of having an impartial jurist determine whether there is sufficient legal cause to use an eavesdropping device. You've removed that completely. So all you have is a state's attorney giving their opinion, put aside the fact that state's attorney Glasgow is biased, and then it goes forward to another prosecutor to charge, and as Ms. Bendick admitted, the Randolph County State's attorney is not doing the same thing that the judge should be doing. So I think it absolutely is prejudicial, and if we don't give relief because these safeguards aren't satisfied, what is the purpose of them? Let me stop you for just one second, though, and this is the problem I'm having with your argument on this issue. If we can all agree that it's one thing in a criminal case for the police to bring in an informant before the court and the court assesses their credibility before issuing an order, is the only difference here the location of the interview? No, it's not the location of the interview. It's that he went into evaluating the application with a preconceived notion as to what the evidence was based on what he saw, and when you're questioning someone... How is that different, though? How is that different than if the police bring the informant in before the court in chambers or in open court and ask questions of them? What does this scenario... How does this scenario differ? The judge went in, asked questions, and gleaned some information about the credibility of Smith, and in my hypothetical, the judge asked questions of an informant that's brought in before the court and assesses their credibility before they issue the writ and that. I'm seeing no difference. And I'll try to not interrupt you as you try and tell me the difference this time. Sure. The difference is that he's not passively sitting in the courtroom listening to an attorney ask questions of Antonio Smith. He is getting information himself that the investigators and law enforcement can use in their case. So you're saying he went beyond the typical is there credibility probable cause? You're saying he went much deeper into his examination of the guy who was going to kill him. Absolutely. But we don't have a transcript of what the questioning was, do we? We know he questioned him for 30 to 45 minutes. Okay, but that could have been on credibility issues alone. How do we know that he went further than credibility issues? Because to determine someone's credibility, you have to get into as many issues as possible. You have to hear that person's full story. And the point I'm trying to make is he got information that law enforcement could use, as opposed to law enforcement giving him information for him to make a determination. But we don't know for sure, since we don't have a record, whether the information that was gleaned was beyond the issue of credibility. Except to look at the time that the interview took. That's the only thing you have to go on. You have the report of the officer, right? Correct. Go ahead. I don't expect an answer to this question, but I'm just posing it as something that we should be interested in. Whose fault is it that we don't have a record and a transcript? We have one. If this would have taken place in a courtroom, there would have been a court reporter at least available to transcribe the conversation. Correct. I personally can't even understand a judge doing this. I really don't. But I still can't get past the issue of, okay, he did it. Even if it's improper, we had a different state's attorney issue the information. The information, even if he gleaned it from the witness, it wasn't the kind of information that wouldn't have been found out anyway had the FBI questioned him. That's why I'm just wondering where the foul is here. Ultimately, clearly in my mind, this judge should not have been doing this. How does that accumulate into error is my concern. You're saying the Giordano case will give me that answer? I believe so. I think the plain language of our eavesdropping statute, when you look at the suppression section, gives you that answer. It doesn't talk about whether there's reasonable cause. It just asks, was the order improperly granted? That's it. Is there any other statutory explanation for that? That's what I was asking Ms. Bendick. She seems to think there is. If I could ask you just to kind of clarify your question. I agree. It says you can suppress it if the recording was improperly granted. Where is the definition of that? She thinks it's in section 108A4. The... I mean, look. In all candidness, I'm not... I'm asking the court to necessarily imply two things into the statute. That a judge must be impartial and that a state's attorney must be impartial so that he or she can exercise sound judgment. Because our position is, without those things, those two safeguards of state's attorney oversight and control and judicial oversight and control would be rendered meaningless. Why would they be there? And if they're not followed, and there's not a remedy for that, you remove all incentive for judges and state's attorneys to follow them. And then the only thing that matters is whether there's a reasonable cause. And in every other context, fourth amendment context and in federal court with respect to the federal eavesdropping statute, they don't look to whether there's sufficient legal cause for ultimately issuing the order. They ask, was that safeguard met? And if not, does it substantially and directly implement the legislature's intent? We already have an answer from the United States Supreme Court in Giordano that the prosecutor oversight position does. And they reversed and suppressed without getting into a reverse sufficient legal cause for that order. Okay. Thank you very much for your answers and arguments, Ben. Thank you both very much. Your Honor? Yes. I'm sorry to interrupt. I never got to answer Justice Bilton's question about cumulative error. If the court permitted me to do that, but if not... Well, let me ask Justice Wharton if he's satisfied. If he is not, then you certainly will absolutely have that opportunity. I would like him to proceed because I think it's, at least in my mind, a primary consideration. How was the result of all the things that you've alleged? Okay. Your Honor, I think when... The first thing that we need to recognize is when we read the Supreme Court's decision in blue, People v. Blue, about cumulative error, one point that the court emphasized was it doesn't matter what the strength of the evidence is. We focus on the errors and did he receive a fair trial? That's the most important point. And when we look at all the errors in his trial, there were errors from the start, from opening statement, where the prosecutor gives essentially a closing argument through jury selection, where we have a Zair error, where the jury isn't asked whether they understand the Zair principles, to improper evidence in the eavesdropping recordings about Mr. Peterson working with the drug cartel, taking hostages at his murder trial, taunting the state police, recordings about Russian hookers, him talking using expletives with respect to Nancy Grace and Geraldo Rivera. None of that is relevant, and that only serves to dirty him up. We have a mini trial about whether he murdered Stacy Peterson. Now, when the state first filed the motion in Lemonade to present that information, they phrased it as, we are just going to focus on establishing that Drew Peterson was a suspect in a person of interest. And the judge said, okay. But then at trial, it turns into we need to prove that he actually murdered Stacy Peterson. And what that does is, it makes him out to be a serial killer. And when you do that, of course a jury is going to say, well, if he killed two wives, certainly he means to kill anyone who means him harm. So of course, yeah, we believe that he tried to have the state's attorney killed. Was this mentioned in closing argument? Was what mentioned, the conviction for killing the former wife, Stacy? He has not been convicted of that, Your Honor. I'm sorry. The other wife. Stacy? No. Kathleen Savio. Savio. Savio. Savio, right. I don't recall specifically if it was. I wouldn't be surprised if it was. But it was the two murder, the two prior murder trial and then the investigation with respect to Stacy, that was a major focus at trial and a major focus of the prosecution. They introduced evidence that in the Kathleen Savio trial, the trial judge found by a preponderance of the evidence that Drew Peterson murdered both these women. And that was presented to the jury in our case. A court finding that he murdered two women. Is that raised in this appeal? Yes, it is. Yes, absolutely. Absolutely. Oh, I see. But did the court the court made a finding that Drew Peterson killed his fourth wife, Stacy? In the Kathleen Savio case, yes. To introduce to introduce our evidence, hearsay statements from both Kathleen and Stacy. And that point was made in this trial. Okay. You know that out of fairness to Ms. Bendick, I think I'd like to ask her a question. I know we're going way beyond time, but Ms. Bendick, this issue of allowing the evidence in about killing a fourth wife for which he has not been charged nor has he been convicted seems a bit prejudicial. What do you have to say to that? Well, first I would say that it is a question of admission of evidence which is subject to the deferential abuse of discretion standard of review. It certainly was relevant and my opponent conceived in his brief that it's relevant to motive. One of the reasons that Drew Peterson was apparently targeting and fixated on state's attorney Glasgow was his fear that someday he would be charged with the murder of his fourth wife, Stacy Peterson. And so that was relevant for that purpose. And so the only question is whether the prejudicial value substantially outweighed its probative value and that itself is subject to the deferential abuse of discretion standard. And as I note in my brief, defendant is kind of not forthright in characterizing some of the record with regard to this issue because on one hand there is the perfectly relevant evidence of why he feared being charged for Stacy's murder. And then there's the separate issue of whether defendant commented now and then about whether he killed her or not. The fact that those were only occasional shows why there was not an abuse of discretion and wasn't at that heightened, you know, substantially more prejudicial than probative that we have to clear for this type of issue. And the other references involved were squarely relevant to motive for why defendant was targeting state's attorney Glasgow because he feared being eventually charged with Stacy's murder. And after all, that needed to be explained to the jury. Why would he have that fear? Well, this is why he might be charged, but he had not yet been charged. Didn't Glasgow charge was involved with the actual one he was convicted of, Savino? That's correct. Why couldn't that be limited to the actual conviction as opposed to bringing in something that he hadn't been charged with? Was that in the overhear? I mean, I haven't read this whole record yet. Right. Well, it's relevant to his motive. I mean, there's actually several motives in play here, but one of the reasons that at least defendant in his sort of skewed way of viewing the world was targeting state's attorney Glasgow was because he feared that he might be charged with Stacy's murder. No, he had not been charged yet, but he feared that happening. That was one reason. He thought by killing state's attorney Glasgow, that he would no longer potentially be charged with that murder. But how do we know that? He said that he said with Glasgow gone, I won't be charged with Stacy's murder. He characterized the assistance in the Will County state's attorney's office as idiots and know if Glasgow's gone, I won't be charged. It's only if Glasgow is there. And he specifically feared that Glasgow would wait until an election season. And that would be the timing of the charge that it would be part of state's attorney Glasgow's sort of election strategy is to bring out this charge with Stacy's murder. So it was linked specifically to Glasgow. And so that I'm sorry, that was in the over here. Yes. Yes. Yes. I wanted to make sure that. Okay. That answers my question. Thank you. Can I make one very brief concluding sentence about the cumulative error since I haven't had a chance? It's very brief. Very brief. I just want to point out he raises eight different errors about cumulative error. But as outlined in the brief, the only one in which any error occurred whatsoever is the 431 B's air air, which the Illinois Supreme Court has said is not second prong plane error. For the reasons in the brief, none of the rest involved air and most of them were not preserved. Thank you. Thank you. Okay, that concludes the arguments. Thank you both. This is a difficult case. We'll take the matter under advisement and an order will issue in due course. And that concludes the oral arguments for